MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:        2024 ME 12
Docket:          Pen-22-257
Argued:          April 6, 2023
Decided:         January 30, 2024

Panel:           STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

## STATE OF MAINE

v.

## RALPH A. TRIPP JR.

LAWRENCE, J.

[¶1]  Ralph A. Tripp Jr. appeals from a judgment of conviction, entered by the trial court (Penobscot County, *Anderson, J.*), for several drug-trafficking offenses, possession of a firearm by a prohibited person, and criminal forfeiture of property.  Tripp argues that he should be immune from prosecution for his drug-related offenses, that the State's conduct during its opening statement and closing argument constituted error, and that the trial court erred by not providing the jury with clear instructions.  We conclude that Maine's immunity statutes do not apply in this case, that any prosecutorial error did not affect Tripp's substantial rights, and that the trial court sufficiently corrected any potential confusion stemming from its initial jury instructions.  We therefore affirm the judgment.

## I.  BACKGROUND

### A.    Factual Background

[¶2]  "Viewed in the light most favorable to the jury's verdict, the record supports the following facts."  *State v. McLaughlin*, 2018 ME 97, ¶ 2, 189 A.3d 262.  Tripp and his wife, Amanda Tripp, resided in a room at a rooming house located in Bangor.  After the Tripps moved into the rooming house, residents of the building noticed an increase in the number of visitors to the building, both during the day and at night, with the most traffic occurring on the weekends.  Residents found hypodermic needles outside the building and in one of the shared bathrooms.  Residents also frequently observed the Tripps letting visitors into the building; the visitors typically stayed at the rooming house for less than fifteen minutes.  On multiple occasions, two prior residents of the rooming house received or purchased scheduled drugs from Amanda or Tripp.

[¶3]  On the morning of April 17, 2021, Tripp called 9-1-1 to report that a person was unconscious in one of the shared bathrooms of the rooming house.  Soon thereafter, the Bangor Fire Department arrived on the scene, and Tripp let them into the rooming house and then directed them upstairs.  Once the Bangor Fire Department was upstairs, the Tripps went into their room, denied knowing the person, and refused to answer the paramedic's questions about

the person.  The paramedics found the person in the shared bathroom with his head under the sink and his feet extending into the hallway, unconscious, not breathing, and without a pulse.  Because the person's core body temperature was still warm, the paramedics attempted to revive him.  After their attempts to revive the person failed, the paramedics pronounced him dead.  The decedent's cause of death was later determined to be acute intoxication from the combined effects of cocaine, heroin, fentanyl, methamphetamine, ethanol, methylphenidate, sertraline, hydroxyzine, alprazolam, clonazepam, and buprenorphine.

[¶4]  Bangor Police arrived on the scene while the paramedics were still treating the decedent.  Tripp exited his room after a police officer knocked, and he was arrested under an outstanding warrant.  Because Tripp appeared intoxicated, he was transported to the hospital.  At the hospital, he was questioned by a police officer.  Tripp disclosed the decedent's first name to the officer and said that the decedent had been in Tripp's room on a few occasions.

[¶5]  While executing a search warrant for Tripp's room, the police seized a handgun with ammunition; approximately twenty-two grams of a fentanyl-heroin blend; thirty grams of cocaine; three grams of methamphetamine; various drug paraphernalia, including previously used

Narcan packaging and hypodermic needles; and baggies with powdery substances in them. The police also seized Amanda's phone, which contained several text messages regarding drug transactions that either were intended for Tripp or referenced Tripp. In addition, while Tripp was being admitted to the hospital, the police seized $1,138 in cash and an unknown number of small bags of cocaine from Tripp's person.

## B.     Procedural History

[¶6]   The State charged Tripp by complaint on April 20, 2021, with various offenses, and a grand jury indicted him on July 30, 2021. The State later filed two superseding indictments, one on September 29, 2021, and the other on November 24, 2021. The last indictment charged Tripp with one count of aggravated trafficking of a scheduled drug that in fact caused the death of a person (Class A), 17-A M.R.S. § 1105-A(1)(K) (2023); three counts of aggravated trafficking of scheduled drugs: fentanyl powder, cocaine, and methamphetamine (Class A), 17-A M.R.S. § 1105-A(1)(B)(1), (M) (2023); one count of possession of a firearm by a prohibited person (Class C), 15 M.R.S.

§ 393(1)(A-1)(1) (2023); and two counts of criminal forfeiture, 15 M.R.S. § 5826 (2023).[1]

## 1.   Motion to Dismiss

[¶7]   Tripp filed a motion to dismiss the indictment on September 24, 2021, and the trial court (*A. Murray, J.*) held a hearing on October 20, 2021.  In his motion, Tripp argued that 17-A M.R.S. § 1111-B (2021)[2] barred prosecution of the State's aggravated trafficking charges. Specifically, Tripp argued that the aggravated trafficking charges were "possession-based conduct," and therefore he was immune from prosecution

---

[1] On April 13, 2022, prior to the start of trial, Tripp pleaded guilty to the charge of forfeiture of a firearm and requested that the trial court be the finder of fact with respect to the charge of forfeiture of cash.

[2] Title 17-A M.R.S. § 1111-B (2021) provides,

> A person who in good faith seeks medical assistance for or administers naloxone hydrochloride to another person experiencing a drug-related overdose or who is experiencing a drug-related overdose and is in need of medical assistance may not be arrested or prosecuted for a violation of section 1107-A, 1108, 1111 or 1111-A or a violation of probation as authorized by chapter 49 if the grounds for arrest or prosecution are obtained as a result of the person's seeking medical assistance, administering naloxone hydrochloride or experiencing a drug-related overdose.

Amendments to 17-A M.R.S. § 1111-B (2021) became effective after Tripp's crimes were committed but prior to Tripp's conviction and appeal, though these amendments are not relevant for the purposes of this appeal. *See* P.L. 2021, ch. 299, § C-1 (effective Oct. 18, 2021); P.L. 2021, ch.434, § 8 (effective Oct. 18, 2021).  Relevant to this appeal, however, are the subsequent substantive amendments to section 1111-B that were made while Tripp's appeal was pending. *See* P.L. 2021, ch. 724, § 1 (effective Aug. 8, 2022); P.L. 2021, ch. 759, § C-1 (effective Aug. 8, 2022) (codified at 17-A M.R.S. § 1111-B (2023)).  Therefore, where we cite the 2021 version of section 1111-B, we refer to the version of the statute in effect prior to the amendments effective October 18, 2021.  Where we cite the 2023 version of the statute, we refer to the most recently amended and current version of section 1111-B, which became effective on August 8, 2022.

6

under section 1111-B, because the indictment based the charges only on the quantity of drugs seized and did not allege that he manufactured, transferred, or sold any scheduled drugs. The trial court denied Tripp's motion to dismiss on November 1, 2021, and reasoned,

> The exemption from criminal liability statute clearly identifies the four crimes for which a defendant may not be prosecuted if the grounds for the charge were obtained as a result of the person seeking medical assistance. The legislature did not include [a]ggravated [t]rafficking or any drug trafficking charge in the statutory provision exempting a defendant from criminal liability. Nor did the legislature use any broad language about possession of drugs in the [e]xemption from criminal liability statute.

### 2. Jury Trial

[¶8] The trial court (*Anderson, J.*) conducted a jury trial on April 13-15 and 19-21, 2022. During its opening statement, the State commented on the events that occurred prior to Tripp calling 9-1-1, as well as Tripp's decision to enter his room and his refusal to answer the paramedics' questions.[3] During closing argument, the State again commented on Tripp's refusal to answer the paramedics' questions.[4] At a later stage of the State's argument, the trial court

---

[3] The prosecutor stated, "You'll hear that [Tripp] and Amanda shut themselves into [their room], denied knowing [the decedent], and refused to answer even basic questions from the medics who were trying to save [the decedent's] life."

[4] The prosecutor argued,

> You heard that [Tripp] and Amanda . . . shut themselves into [their room] and wouldn't answer questions from the EMTs or paramedics. They wouldn't admit to

sustained Tripp's objection to the prosecution's comment, "And I'm going to ask you, when you are deliberating, don't compromise on [the decedent's] life," and issued a curative instruction.[5]

[¶9]  At the close of evidence on April 20, 2022, the trial court denied Tripp's motion for a judgment of acquittal.  The trial court proceeded to orally instruct the jurors and then gave the jurors a written version of its instructions. At one point during the oral jury instructions, the trial court stated that it was not reading aloud a portion of the instructions because the instructions were "exactly the same" as those it gave earlier for the other possession charges.  The

---

knowing this person; wouldn't say who he was; wouldn't help to identify the patient so that maybe they could find his medical history or anything else that might help them to try to resuscitate this person.  They wouldn't tell [the EMTs or paramedics] what he took.  Nothing.  They were panicked.  They turtled.  They shelled themselves in that apartment and willed it to all go away.  But it did not.  They did not expect the neighbors to point the police directly to [their room], which they did.

In addition, the prosecutor argued that Tripp "dragged the [decedent's] body outside [of his room]" and that "there, under the sink, is likely where [the decedent] drew his last breath and died, alone, abandoned by his friend, abandoned by his dealers . . . ."

[5] The trial court's limiting instruction stated, in full,

I just wanted to say something briefly based on the last comments that were just made.  I'll be giving you full instructions on all aspects of the case, including deliberation, including giving up a well-reasoned belief simply because you want to go home, and I'm going to advise that you don't do that.  I'm going to talk about jury deliberations and giving up beliefs, things like that.  So, I will be giving you the proper instructions on that, and -- and the word compromise on his death was mentioned. It's not correct to appeal to [a] jury's sympathies or emotions or things like that in an argument.  I will be telling you that you rationally look at the facts, and you make your findings based on a rational application of the facts, and you come out and give us your ver -- your verdict, and that is basically what you're going to have to do.

trial court, however, clarified that the jurors could read the skipped instructions later if they felt that they needed to do so. The oral and written instructions also referenced the attorneys' explanations of the statutory terms "contributing factor" and "cause." In addition, the oral and written instructions directed the jurors to decide the aggravated trafficking charge first and only address lesser included offenses if necessary; to skip consideration of the charge of aggravated trafficking in fentanyl powder; and to decide the charge of trafficking in cocaine. The trial court later issued further instructions to the jury to clarify the order of the jury's analysis.

[¶10] As to the count charging Tripp with trafficking in scheduled drugs that contributed to the death of the decedent, the jury returned a not guilty verdict, but the jury found Tripp guilty of the lesser included offense of aggravated trafficking in scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(M). The jury also found Tripp guilty of trafficking in fentanyl powder, cocaine, and methamphetamine, and of illegal possession of a firearm. The trial court separately found that the $1,138 seized from Tripp was subject to criminal forfeiture.

### 3. Sentencing

[¶11] The trial court held a sentencing hearing on July 18, 2022. With respect to the charge of aggravated trafficking in fentanyl, the trial court sentenced Tripp to incarceration for a term of twenty years with all but twelve years suspended and four years of probation. The trial court sentenced Tripp to incarceration for terms of twelve years each for the charges of aggravated trafficking in cocaine and methamphetamine, for a term of ten years for the lesser included offense of aggravated trafficking in scheduled drugs, and for a term of three years for illegal possession of a firearm, with each sentence to run concurrently with his twenty-year sentence for aggravated trafficking in fentanyl powder. Tripp timely appealed. M.R. App. P. 2B(b)(1).

## II. DISCUSSION

**A. Title 17-A M.R.S. § 1111-B (2023) does not retroactively apply and the appropriate version of the immunity statute to be applied in this case is 17-A M.R.S. § 1111-B (2021), which was the version of the statute in effect at the time that Tripp's crimes were committed.**

[¶12] Tripp argues that 17-A M.R.S. § 1111-B (2023) should retroactively apply to this case—rather than 17-A M.R.S. § 1111-B (2021) applying—and that

the more recently amended statute would provide him with immunity from prosecution for all charges brought against him.[6]

[¶13]  "We review de novo whether a statutory amendment will be applied retroactively or prospectively."  *MacImage of Me., LLC v. Androscoggin Cnty.*, 2012 ME 44, ¶ 21, 40 A.3d 975.  When an action is pending and a statute applicable to that action is amended, "the legislatively created rule of construction set forth in 1 M.R.S. § 302 (2023) applies."  *State v. Beeler*, 2022 ME 47, ¶ 1 n.1, 281 A.3d 637.  In relevant part, section 302 provides,

> The repeal or amendment of an Act or ordinance does not affect any punishment, penalty or forfeiture incurred before the repeal or amendment takes effect, or any action or proceeding pending at the time of the repeal or amendment, for an offense committed or for recovery of a penalty or forfeiture incurred under the Act or ordinance repealed or amended.  Actions and proceedings pending at the time of the passage, amendment or repeal of an Act or ordinance are not affected thereby.

We have explained that "section 302 provides a rule of construction only, and the rule is controlling absent clear and unequivocal language to the contrary."  *Reagan v. Racal Mortg.*, 1998 ME 188, ¶ 7, 715 A.2d 925 (quotation marks omitted).

---

[6]  Tripp further asserts that Maine's Saving Statute, 1 M.R.S. § 302 (2023), is unconstitutionally overbroad such that, when it is applied in conjunction with the amended section 1111-B, his due process and equal protection rights under both the Maine Constitution and the United States Constitution are violated.  We find Tripp's arguments unpersuasive and do not address them further.

[¶14]  Although "punishment, penalty or forfeiture" is not defined within section 302, we have applied the statute where the Legislature has made amendments to criminal statutes.  *See, e.g.*, *State v. Alley*, 263 A.2d 66, 68-69 (Me. 1970) ("Punishment is the penalty for the transgression of the law, and the sentence imposed by the trial court is a 'punishment' or 'penalty' within the terms of [section 302]." (citation omitted)).  We have also held that a "[p]unishment, penalty or forfeiture is incurred[] at the time the offense for which punishment is imposed *is committed*."  *Id.* at 69 (emphasis added) (alteration and quotation marks omitted).

[¶15]  This general rule of statutory construction may be overcome if a provision expressly cites section 302 or states explicitly that it should be applied to pending proceedings.  *MacImage*, 2012 ME 44, ¶ 22, 40 A.3d 975.  With respect to an amended criminal statute, "*[a]bsent clear and unequivocal language to the contrary*, a statutory amendment does not affect any penalties that were incurred before the amendment took effect, nor does it apply to crimes committed prior to the time the amendment was enacted."  *State v. Shepley*, 2003 ME 70, ¶ 9, 822 A.2d 1147 (emphasis added); *see, e.g.*, *Beeler*, 2022 ME 47, ¶ 1 n.1, 281 A.3d 637.  Thus, to determine whether an amended criminal statute retroactively applies, we have consistently examined

"(1) whether the Legislature expressed the intent to make the statute retroactive in its application" and, if so, (2) "whether that retroactive application [of the statute] violates any provisions of the Maine Constitution." *E.g.*, *MacImage*, 2012 ME 44, ¶¶ 21-37, 40 A.3d 975.

[¶16]   In this case, the amended version of section 1111-B must overcome section 302's general rule of statutory construction in order to have a retroactive effect on Tripp's charged crimes.[7]   The amended version of section 1111-B, however, does not say that it should be retroactively applied to pending actions.   Given the absence of clear and unequivocal language to the contrary, the newly amended section 1111-B cannot retroactively apply to Tripp's criminal penalties.   Because Tripp's penalties were incurred at the time that his crimes were committed, *see Alley*, 263 A.2d at 69, the appropriate immunity statute to be applied in this case is 17-A M.R.S. § 1111-B (2021), which was in effect at the time that Tripp's crimes were committed, *see*

---

[7]   Tripp argues that section 302 should not apply in this case because immunity is not a "punishment, penalty or forfeiture."   Tripp's argument, however, is contrary to the plain language of the statute.   Section 302 plainly states that "[t]he repeal or amendment of an Act or ordinance does not *affect* any punishment, penalty or forfeiture incurred before the repeal or amendment takes effect."   1 M.R.S. § 302 (emphasis added).   Retroactively applying the amended version of section 1111-B, thereby providing Tripp with immunity to prosecution, would certainly "affect" the penalty and punishment that applies to Tripp's charged crimes.

*generally supra* n.2. We therefore need not determine whether retroactive application of the statute would violate Tripp's constitutional rights.

**B.    The trial court correctly determined that, pursuant to 17-A M.R.S. § 1111-B (2021), Tripp is not immune from the charges brought against him.**

[¶17] Tripp next argues that, even if the newly amended section 1111-B does not retroactively apply in this case, the trial court erred by denying his motion to dismiss on the ground that 17-A M.R.S. § 1111-B (2021) provides him with immunity from prosecution. Tripp asserts that, because he was charged for trafficking based on his possession of certain quantities of scheduled drugs, the State needed to prove possession at trial, and the Legislature's cross-referencing the unlawful possession statute, 17-A M.R.S. § 1107-A (2021), shows that it intended to include possession-based crimes in its immunity statute.[8]

[¶18] We have not yet had the opportunity to review the circumstances in which 17-A M.R.S. § 1111-B (2021) provides an accused with immunity and, therefore, this case presents "an issue of first impression" and "a matter of statutory interpretation that we review de novo." *Genujo Lok Beteiligungs*

---

[8] The subsections of the unlawful possession statute relevant to Tripp's argument have remained unchanged since that time. *See* 17-A M.R.S. § 1107-A (2023).

14

*GmbH v. Zorn*, 2008 ME 50, ¶ 25, 943 A.2d 573. "When interpreting a statute, we first look at the plain meaning of the statutory language, seeking to give effect to legislative intent, and consider the particular language in the context of the whole statutory scheme." *Racal Mortg.*, 1998 ME 188, ¶ 7, 715 A.2d 925 ("We construe the language [of a statute] to reach a harmonious result and to avoid absurd, illogical, or inconsistent results."). We look to the legislative history of the statute only if its language is ambiguous. *See id.*

[¶19] Title 17-A M.R.S. § 1111-B (2021) provides, in full,

> A person who in good faith seeks medical assistance for or administers naloxone hydrochloride to another person experiencing a drug-related overdose or who is experiencing a drug-related overdose and is in need of medical assistance may not be arrested or prosecuted for a violation of section 1107-A, 1108, 1111 or 1111-A or a violation of probation as authorized by chapter 49 if the grounds for arrest or prosecution are obtained as a result of the person's seeking medical assistance, administering naloxone hydrochloride or experiencing a drug-related overdose.

The statute unambiguously identifies the violations for which the accused is immune from arrest or prosecution. If the accused, in good faith, either sought medical assistance or administered naloxone for another person while that person was experiencing a drug-related overdose, the accused can seek immunity from arrest or prosecution *only for the four enumerated crimes within the statute.*

[¶20]  Our conclusion is further supported by considering the statute in the context of the statutory scheme of Chapter 45 (Drugs), which demonstrates that the Legislature intended to bar prosecution for crimes that are associated with drug use while still permitting prosecution for crimes that involve trafficking, furnishing, cultivating or fabricating, or importing drugs. *Compare* 17-A M.R.S. §§ 1107-A, 1108, 1111, 1111-A (2021), *with* 17-A M.R.S. §§ 1103 to 1106-A, 1116 to 1118-A, 1124 (2021).  Moreover, the Legislature demonstrated within 17-A M.R.S. § 1111-B (2021) itself that it knew how to reference *both* individual statutes and entire chapters.  If the Legislature wished to include trafficking crimes in 17-A M.R.S. § 1111-B (2021), it would have cited either to those statutes specifically or to Chapter 45 in its entirety. *Cf. State v. Flemming*, 377 A.2d 448, 456 (Me. 1977) (Dufresne, C.J., concurring) (explaining that, if the Legislature intended to include terms within an amendment, "it could easily have employed apt language therefor." (quotation marks omitted)).  The trial court therefore correctly determined that Tripp was

16

not immune from prosecution under the version of section 1111-B in effect at the time he committed the charged offenses.

**C.    Where prosecutorial error occurred in this case, such error either did not affect Tripp's substantial rights or was harmless.[9]**

**1.    The State's references to Tripp's refusal to speak with paramedics did not constitute prosecutorial error.**

**a.    Tripp did not invoke his right to remain silent.**

[¶21]   We review for obvious error when a defendant "d[oes] not explicitly object to the testimony and the prosecutor's comments concerning his [right to remain silent]." *State v. Lovejoy*, 2014 ME 48, ¶ 19, 89 A.3d 1066. "[T]o vacate a conviction based on the obvious error standard of review, there must be (1) an error, (2) that is plain, . . . (3) that affects substantial rights . . . [and] (4) the error [must] seriously affect[] the fairness and integrity or public reputation of judicial proceedings." *Id.* (quotation marks omitted).   "The defendant's burden . . . is significant," and we have explained that "[w]hen a

---

[9] In this case, Tripp does not allege that the prosecutor's statements were made in bad faith and instead focuses on the impact that the prosecutor's statements had on his trial.  Therefore, our review will focus on Tripp's claim of prosecutorial *error* and an assessment of the impact of the alleged error on Tripp's due process rights.  *See State v. White*, 2022 ME 54, ¶¶ 19-20 & n.9, 285 A.3d 262 (using "the term 'error' instead of 'misconduct' because our review focuses not on the prosecutor's subjective intent but on the due process rights of the defendant").  Further, although Tripp alluded to article 1, section 6, of the Maine Constitution in his appellate brief, he failed to develop an argument based on that provision of the Maine Constitution, and we deem any state constitutional claims waived.  *Contra id.* ¶ 31 n.13.  We therefore address only Tripp's claims asserted under the Fifth Amendment of the United States Constitution.

prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding." *State v. Dolloff*, 2012 ME 130, ¶ 38, 58 A.3d 1032.

[¶22] The Fifth Amendment right to remain silent includes measures that exist in multiple contexts, including "protections against compelled self-incrimination both before and after arrest." *Lovejoy*, 2014 ME 48, ¶¶ 20-22, 89 A.3d 1066. Although we have regularly considered a defendant's Fifth Amendment right to remain silent when interacting with law enforcement officers, *see, e.g.*, *id.* ¶ 17; *State v. Rutherford*, 2019 ME 128, ¶¶ 3, 20, 214 A.3d 27; *State v. Nobles*, 2018 ME 26, ¶¶ 22-26, 179 A.3d 910, we have not yet considered whether the right to remain silent extends to situations where paramedics, rather than law enforcement officers, question a defendant about the emergency situation they are responding to. However, we need not address this question now.[10] Even if the right to remain silent extends to a paramedic's

---

[10] If, in the future, we were to consider whether the right to remain silent applied in such circumstances, we would need to square a defendant's right to remain silent with our recognized health and safety exception. *Compare Coppola v. Powell*, 878 F.2d 1562, 1565 (1st Cir. 1989) (explaining that "[t]he privilege [to remain silent] can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory" and that "viability of the privilege depends on whether a responsive answer to the question might result in harmful disclosure" (quotation marks omitted))*, with State v. Lockhart*, 2003 ME 108, ¶ 18, 830 A.2d 433 ("[A]n officer is permitted to ask questions to identify the suspect, check his or her identification and *resolve any health or safety*

18

questioning, we conclude that Tripp failed to demonstrate that he invoked his right to remain silent in this non-custodial context. Although "we have never required the use of any specific words for a person to enjoy constitutional protection for his or her silence," we do require that "the record demonstrate the defendant's intention to exercise the constitutional right against compelled self-incrimination." *Lovejoy*, 2014 ME 48, ¶ 25, 89 A.3d 1066. "Thus, in many contexts, a defendant is not deemed to have exercised the constitutionally protected right against compelled self-incrimination by virtue of silence alone." *Id.*

[¶23] "To determine whether a defendant did express the intention to exercise this Fifth Amendment right, a court must consider the specific circumstances in which a defendant was questioned and the defendant's response to that questioning." *Id.* ¶ 26. Here, after Tripp let the paramedics into the rooming house and directed them upstairs to the unconscious person, he went into his room, denied knowing the person, and refused to answer the paramedic's questions about the person. He was not in custody, and beyond remaining silent, Tripp did not expressly state nor otherwise manifest his

_____

*concerns regarding the suspect or others.*" (emphasis added) (alterations and quotation marks omitted)).

intention to exercise the constitutional right against self-incrimination. These facts are not sufficient to demonstrate Tripp's invocation of his Fifth Amendment right against self-incrimination. *Cf id*. ¶ 26 (invocation of right against self-incrimination by terminating telephone conversation with detective after stating desire to speak with a lawyer and refusing to return detective's subsequent phone calls); *State v. Patton*, 2012 ME 101, ¶ 15, 50 A.3d 544 (request to speak with a lawyer during pre-arrest, pre-*Miranda* warning interaction with law enforcement constitutes invocation of right to remain silent); *see also Wainwright v. Greenfield*, 474 U.S. 284, 295 n. 13 (1986) (noting that "silence" includes "the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted").

> **b. The evidence of Tripp's refusal to answer the paramedics' questions was admissible; therefore, the State's references to this conduct did not constitute prosecutorial error.**

[¶24]  In this case, the State elicited testimony that Tripp refused to answer the paramedics' questions regarding the decedent's condition. As noted above, because Tripp did not invoke his right against self-incrimination, this testimony was admissible at trial. *See Nobles*, 2018 ME 26, ¶ 26, 179 A.3d 910. During closing argument, the State suggested that Tripp's silence evidenced a consciousness of guilt. "A lawyer is permitted to argue on [her or

his] analysis of the evidence, for any position or conclusion with respect to the matters stated therein, and the central question is whether the comment is fairly based on facts in evidence." *Dolloff*, 2012 ME 130, ¶ 43, 58 A.3d 1032 (citation omitted); *see also State v. Cheney*, 2012 ME 119, ¶ 35, 55 A.3d 473 ("The State is free . . . to forcefully argue to the jury that the evidence does not support or is not consistent with the defendant's theory of the case."). Because Tripp did not invoke his right to remain silent, he has not established any error, let alone obvious error "so clear under existing law that the court and the prosecutor were required to address the matter even in the absence of a timely objection." *Nobles*, 2018 ME 26, ¶ 21, 179 A.3d 910 (quotation marks omitted).

**2.  Although the State's references to Tripp's involvement with the decedent's death constituted prosecutorial error, the error did not affect Tripp's substantial rights.**

[¶25]  Where Tripp did not object to the State's closing arguments, we review for obvious error. *See Lovejoy*, 2014 ME 48, ¶ 19, 89 A.3d 1066. We review "allegations of prosecutorial [error] in the overall context of the trial." *Dolloff*, 2012 ME 130, ¶ 44, 58 A.3d 1032. In *Dolloff*, we explained that "prosecutors [must] walk a careful line" due to the "competing obligations" of making "unflinching and assertive efforts to prosecute those who are alleged to have committed crimes" and "avoid[ing] inviting a jury to make its decision

based on bias, prejudice, conjecture, or any other impermissible basis." *Id.* ¶¶ 40-41. We also summarized the types of statements that "will almost always be placed in the category of [prosecutorial error]," which include "[m]isrepresenting material facts in the record or making statements of material fact unsupported by any evidence . . . [and] [m]aking statements pandering to jurors' sympathy, bias, or prejudice." *Id.* ¶¶ 42-43.

[¶26]  In this case, the State's comments regarding Tripp's thoughts and actions prior to the arrival of the paramedics and police constituted prosecutorial error because those comments were not supported by the evidence presented at trial.  For example, no evidence was presented to support the prosecutor's comments that Tripp and Amanda "dragged the [decedent's] body outside [of their room]" nor that the decedent "likely . . . drew his last breath and died, alone, . . . [under the sink]." *See supra* n.4.  These statements constituted plain error. *See Dolloff*, 2012 ME 130, ¶ 36, 58 A.3d 1032 ("An error is plain if the error is so clear under current law, that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." (citations, and alteration and quotation marks omitted)).  Nevertheless, we conclude that this plain error did not affect Tripp's substantial rights because the jury acquitted Tripp on the charge of aggravated

trafficking of a scheduled drug that in fact caused the death of a person. Thus, the jury apparently did not give any weight to the State's comments, and the prosecutorial error could not have been sufficiently prejudicial to have affected the outcome of the proceeding.

3. **The State's request that the jury not compromise on the decedent's life during deliberations was harmless because the trial court gave a prompt curative instruction that directly addressed the prosecutor's error and adequately eliminated any prejudice.**

[¶27] "The importance of bringing alleged error, including prosecutorial misconduct, immediately to the attention of the trial court is manifested in the standards of review for errors that were objected to at trial." *Dolloff*, 2012 ME 130, ¶ 31, 58 A.3d 1032; *see* M.R.U. Crim. P. 52(a). Because Tripp objected to the prosecutor's statement asking the jurors to not compromise on the decedent's life during deliberations, "we review to determine whether there was actual [error] and, if so, whether the trial court's response remedied any prejudice resulting from the [error]." *Lovejoy*, 2014 ME 48, ¶ 31, 89 A.3d 1066. "We will generally defer to the determination of a presiding Justice, who has the immediate feel of what is transpiring, that a curative instruction will adequately protect against the jury giving consideration to matters which have been heard but have been stricken as evidence." *Dolloff*, 2012 ME 130, ¶ 32, 58 A.3d 1032

(quotation marks omitted). "Any concern created by improper statements made by a prosecutor is likely to be cured by a prompt and appropriate curative instruction, especially when such an instruction is specifically addressed to the prosecutor's [error]." *Id.* (quotation marks omitted). Therefore, a curative instruction will only be deemed inadequate to eliminate prejudice "where there are exceptionally prejudicial circumstances or prosecutorial bad faith." *Id.* (quotation marks omitted).

[¶28]   In this case, the trial court promptly provided a curative instruction upon Tripp's objection to the prosecutor's statement. As noted *supra*, making statements pandering to jurors' sympathy, bias, or prejudice is almost always error, and we affirm the trial court's categorization of the State's statement as error. In its curative instruction—which was given immediately after holding a sidebar in response to Tripp's objection—the trial court instructed the jury that it was "not correct to appeal to [a] jury's sympathies or emotions like that in an argument" and that the trial court would later give the jury "proper instructions" on deliberation and to making findings "based on a rational application of the facts." *See supra* n.5. Thus, in its prompt curative instruction, the trial court specifically addressed the prosecutor's error and

24

adequately eliminated any prejudice that may have resulted. We therefore conclude that such error was harmless.

**D.** **The trial court sufficiently corrected any potential confusion stemming from its initial jury instructions and therefore did not commit obvious error because Tripp's rights were not substantially affected.**

[¶29] Because Tripp did not raise an objection to the trial court's jury instructions, we review for obvious error. *State v. Villacci*, 2018 ME 80, ¶ 9, 187 A.3d 576. Our review considers "the jury instructions *in their entirety* to determine if the instructions failed to inform the jury correctly and fairly in all necessary respects of the governing law." *Id.* (emphasis added) (alteration and quotation marks omitted); *see also State v. Clark*, 2021 ME 12, ¶ 16, 246 A.3d 1165 ("We review jury instructions as a whole for prejudicial error . . . ." (quotation marks omitted)). The trial court has the discretion to provide the jury with written instructions that cover "all or a part of what is orally provided." M.R.U. Crim. P. 30(b).

[¶30] In *Lockhart*, we concluded that the trial court did not commit obvious error by orally providing instructions to the jury on the State's burden of proof but not including them in the written instructions provided to the jury. 2003 ME 108, ¶ 44, 830 A.2d 433. In our review, we "[c]onsider[ed] the spoken and written instructions as a whole" to determine if the missing written

instructions substantially affected the defendant's rights. *Id*. In reaching our conclusion, we reasoned that the defendant "did not object to the absence . . . [of the instruction] in the proposed written instructions when they were discussed by counsel and the judge." *Id*.

[¶31] Here, Tripp is mistaken that the trial court instructed the jury to rely on the attorneys' definitions for the statutory element of a "contributing factor." Rather, the trial court merely referenced the attorneys' "discuss[ion] of the meanings of the words" and proceeded to provide the jury with specific instruction on the law. Although the trial court's reference may have been confusing in isolation, when looking at the instructions as a whole, the trial court informed the jury of the term's legal meaning.

[¶32] We also find unconvincing Tripp's assertion that the trial court erred by not reading the written instructions in full. Here, the trial court merely skipped over portions that were "exactly the same" as the identical elements in other charged offenses. In addition, the trial court informed the jury of the definitions it was skipping and why it was skipping them, and then directed the jury to the appropriate location in the written instructions to refer to if the jury had additional questions. Moreover, the trial court's written instructions, which Tripp did not object to, provided a sufficient, stand-alone definition of

the redundant portions.  Therefore, the oral and written jury instructions, in their entirety, correctly and fairly informed the jury of all necessary respects of the governing law.

[¶33]  Finally, we disagree with Tripp's assertion that, given the trial court's deviations and ambiguities between the oral instructions, written instructions, and jury verdict forms, the trial court obviously erred by failing to provide the jury with a clear roadmap of how it should analyze the several charges.  When all the jury instructions are taken as a whole, the trial court provided the jury with a sufficient roadmap to reach a guilty or not guilty verdict for each crime as charged.  Although Tripp is correct that the written instructions appear to have misstated the steps that the jury should have taken as they analyzed the various charges, the trial court appears to have corrected the jury instructions and clarified the verdict form to account for these misstatements; answered a question from the jury as to the correct analysis it should take with respect to the offenses as charged, including the lesser included offense for the charge of aggravated trafficking of a scheduled drug that in fact caused the death of a person; and clarified that the jurors "do not have to take up [the charges] in the order in which [the trial court] mentioned them in [its] instructions or, for that matter, [as they appeared] in the verdict

form." The trial court further clarified that the jury must "do the thorough analysis" on each count, but the analysis on each count could "be done in any order that [the jury] want[s] to do it."[11] We therefore conclude that the trial court appropriately and sufficiently corrected any potential confusion stemming from its initial jury instructions and that Tripp's rights were not substantially affected. As a result, the trial court did not commit obvious error. *See State v. Lovejoy*, 2014 ME 48, ¶ 19, 89 A.3d 1066 (holding that elements of obvious error include that the error affect the defendant's substantial rights).

The entry is:

Judgment affirmed.

_____

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Camden, for appellant Ralph A. Tripp, Jr.

Aaron M. Frey, Attorney General, and Jason Horn, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot Unified Criminal Docket docket number CR-2021-1115
FOR CLERK REFERENCE ONLY

_____

[11] Tripp did not object to any of these curative instructions.